EILEEN N. GRECO *v.* GEORGE GRECO ET AL.
(AC 22797)

Lavery, C. J., and DiPentima and Stoughton, Js.

Argued November 18, 2003—officially released May 11, 2004

*James R. Greenfield*, with whom was *Kelly P. Lutz Mai*, for the appellant (named defendant).

*William F. Gallagher*, with whom, on the brief, was *Barbara L. Cox*, for the appellee (plaintiff).

*Opinion*

LAVERY, C. J. The defendant George Greco[1] appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Eileen Greco. On appeal, the defendant claims that the court, in fashioning its financial orders, (1) overvalued the defendant's stock in Greco's Auto Parts, Inc., (2) improperly awarded the plaintiff 98 percent of the parties' marital assets, (3) improperly relied on gross income, rather than net income, in determining the defendant's alimony obligation, (4) improperly ordered the defendant to pay alimony and other expenses that exceed his available income, and (5) abused its discretion in awarding the plaintiff $100,000 in attorney's fees. We agree with the defendant's third and fourth claims, which are interrelated, and, accordingly, reverse the judgment of the trial court.[2]

The following facts and procedural history are relevant to our resolution of the defendant's claims. The

---

[1] Also named as defendants were George Greco's five children from a previous marriage, two trusts George Greco established for two children he fathered with the plaintiff and the LDGG Limited Partnership in which he has an ownership interest. Because only George Greco has appealed, we refer to him as the defendant.

[2] On the basis of our disposition of the defendant's third and fourth claims, we need not address the defendant's other claims on appeal.

plaintiff and the defendant were married on September 28, 1974. It was the second marriage for both parties. At the time of the marriage, the defendant had custody of his five children from his prior marriage and the plaintiff had custody of a child born during her prior marriage. In 1997, DNA testing revealed that the defendant is that child's biological father. The parties also had a child together born during their marriage.

Before the parties were married, the defendant owned and operated a gasoline service station. After they were married, the defendant sold the service station and opened an auto parts business. The defendant's five children from his prior marriage were all involved in operating the auto parts business, Greco's Auto Parts, Inc., as was the parties' first child. The defendant also formed and controlled a partnership called LDGG Limited Partnership. Throughout the marriage, the plaintiff was a full-time homemaker, caring for the children and managing the household.

In February, 2000, the plaintiff brought this dissolution action by a one count complaint, claiming an irretrievable breakdown in the marital relationship. She sought the dissolution of the parties' marriage, an equitable distribution of the parties' property, alimony and attorney's fees. On September 25, 2001, the plaintiff filed a three count third amended complaint. The first count was directed against the defendant and was identical to the one count in the original complaint. The second count was directed against the defendant, the defendant's five adult children from his prior marriage, two "spray trusts" established for the parties' two children and the LDGG Limited Partnership. That count alleged that the defendant's transfers of certain assets were fraudulent in violation of the Uniform Fraudulent Transfer Act, General Statutes § 52-552a et seq., and, therefore, they should be set aside and the assets

returned to the marital estate.[3] The third count essentially was identical to the second count.

On October 11, 2001, the defendant filed an answer and a counterclaim for dissolution of marriage. On October 30, 2001, the defendant's five children from his prior marriage filed an answer, special defenses and a four count counterclaim.[4] They also filed a claim for a jury trial. On that same date, the LDGG Limited Partnership and the trustee of the two trusts filed their answers and special defenses. On November 8, 2001, the plaintiff filed an answer and special defenses to the counterclaims of the defendant's five children from his prior marriage.[5]

After a lengthy trial, the court dissolved the parties' marriage on January 11, 2002, on the basis of irretrievable breakdown. The court also determined that the plaintiff failed to prove her "fraudulent transfer claims by the requisite clear and convincing evidence."[6] The court, however, stated that although it would not set aside the transfers or include the assets involved in the marital estate, it would consider the defendant's removal of those assets from the marital estate in fashioning its financial orders.

[3] Between 1998 and 1999, the defendant transferred to his children, either directly or via trust, the majority of his stock in Greco's Auto Parts, Inc., and title to various parcels of real estate related to that business. Those assets were worth more than $1 million.

[4] One of the defendant's children, George Greco, Jr., subsequently passed away and the administratrix of his estate was substituted as a party. On November 27, 2001, the administratrix filed an answer to the plaintiff's third amended complaint.

[5] On May 14, 2001, the court ordered that "the issues of the dissolution of marriage, property and alimony and other claims together with the counts on fraudulent conveyances and the special defenses of the defendant children will be tried to the court. After the court decides these issues and enters judgment, the court will address the issues relative to the defendant children's counterclaims."

[6] We note that the court's finding that the transfers were not fraudulent is not an issue in this appeal.

In its orders, the court ordered the defendant to pay to the plaintiff $710 per week in alimony until the death of either party, the plaintiff's remarriage or her cohabitation. It also ordered the defendant to maintain his life insurance for the plaintiff's benefit and to provide health insurance for her for three years. The court further ordered the defendant to transfer to the plaintiff his interest in the marital residence at 24 Sunbrook Road in Woodbridge. In addition, the court ordered the defendant to transfer to the plaintiff his stock in Greco's Auto Parts, Inc., or, alternatively, the value of that stock, which the court found to be $250,000. Finally, the court ordered the defendant to transfer to the plaintiff his individual retirement account, which was valued at approximately $9900, and to pay to the plaintiff $100,000 in attorney's fees. The defendant now appeals from those orders.

We address the defendant's third and fourth claims together because they are interrelated. The defendant claims that the court improperly relied on gross income, rather than net income, in determining the defendant's alimony obligation. The defendant also claims that the court improperly ordered him to pay alimony and other expenses that far exceeded his available net income. We agree with both claims.

Initially, we set forth our standard of review. "We review financial awards in dissolution actions under an abuse of discretion standard. . . . In order to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did." (Internal quotation marks omitted.) *Evans* v. *Taylor*, 67 Conn. App. 108, 111, 786 A.2d 525 (2001). "In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Internal quotation marks omitted.) *DiVito* v. *DiVito*, 77 Conn. App. 124, 130, 822 A.2d 294, cert. denied,

264 Conn. 921, 828 A.2d 617 (2003). Mindful of those principles, we now turn to the issue of whether the court incorrectly applied the law by basing its financial orders on the parties' gross incomes.

"It is well settled that a court must base . . . alimony orders on the available net income of the parties, not gross income." *Morris* v. *Morris*, 262 Conn. 299, 306, 811 A.2d 1283 (2003); see also *Ludgin* v. *McGowan*, 64 Conn. App. 355, 358, 780 A.2d 198 (2001).

In the present case, although the court, in its memorandum of decision, did not "affirmatively and expressly" state that it relied on the parties' gross incomes in determining its alimony order; see *Morris* v. *Morris*, supra, 262 Conn. 306; it did find that the defendant had "a $73,840 annual income from the auto parts business . . . ." That amount is equal to the defendant's gross income as stated in his financial affidavit. In addition, in its financial orders, the court ordered the defendant to pay to the plaintiff $710 per week in alimony, which is precisely 50 percent of the defendant's gross income. Both parties submitted financial affidavits in which they stated their net income. The court, therefore, had before it evidence of the parties' net incomes, but failed to mention such income and, instead, focused on the defendant's gross income.[7]

The court's reliance on the gross incomes of the parties in fashioning its financial orders is further evinced by the fact that the court ordered the defendant to pay alimony and other expenses that far exceeded his available net income.[8] The court ordered the defendant

---

[7] The court found that "[d]espite testimony about some income from [the plaintiff's] porcelain doll hobby or business, no income capacity is assigned to the [plaintiff] . . . ."

[8] We note that our jurisprudence requires the court to consider the statutory criteria set forth in General Statutes § 46b-82 in determining whether alimony shall be awarded, and the duration and amount of the award. Those criteria are "the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each

to pay alimony in the amount of $36,920 per year, life insurance premiums for the plaintiff in the amount of $12,480 per year and health insurance premiums for the plaintiff in the amount of $5972.16 per year. Those payments, when deducted from the defendant's gross income, as found by the court, leave the defendant with $18,467.84.[9] The court also required the defendant to pay $20,000 per year toward the plaintiff's attorney's fees,[10] which leaves the defendant with a yearly *gross income* deficit.[11] Moreover, because the court awarded the plaintiff $720,936.56 out of the parties' $731,870.21 total marital assets, the defendant has virtually no assets that can be used to meet his annual deficit or to provide for his ordinary living expenses.

In addition, in light of the court's findings with respect to the defendant's age, health and ability to work,[12] it

of the parties and the award, if any, which the court may make pursuant to [General Statutes §] 46b-81 . . . ." General Statutes § 46b-82.

[9] Because the court did not make any finding with respect to the defendant's net income, there is no evidence as to what the defendant's after tax net income would be after making the alimony, life insurance and health insurance payments; however, it certainly would not be more than and likely would be less than his gross amount. In his financial affidavit, the defendant stated that his net income is $53,872 per year. If that figure is used, the defendant already is left with a deficit after making only those payments to the plaintiff.

[10] Specifically, the court ordered the defendant to pay to the plaintiff $100,000 in attorney's fees at a rate of $20,000 per year.

[11] We note that although the court made no specific findings with respect to the defendant's unpaid attorney's fees, if factored in, that expense would certainly increase the defendant's deficit. Also, although the court found that the defendant gambles extensively, it did not find that the defendant's winnings exceeded his losses, thereby, serving as an additional source of income for the defendant.

[12] In it memorandum of decision, the court stated in relevant part: "[The defendant] is sixty-four years of age, completed the eighth grade . . . and has been engaged in the auto repair and parts business throughout his life. His health is very poor. He suffers from angina and other related health problems which commenced in 1988. After numerous surgical procedures, he remains under the care of various physicians, takes nine different medications and is depressed. It would appear that his ability to work has been seriously compromised."

is clear that the defendant's ability to earn income is entirely dependent on his control of Greco's Auto Parts, Inc.,[13] and the source of that control is his sixty-five shares of stock in the corporation, which represent 53.3 percent of the total shares having voting power.[14] In its orders, however, the court ordered the defendant to transfer to the plaintiff his stock in Greco's Auto Parts, Inc., or, alternatively, to pay to the plaintiff the value of that stock, which the court found to be $250,000. If the defendant retains the stock, the court gave him two payment options (1) a lump sum of $250,000 paid within ninety days or (2) a "promissory note in the amount of

[13] Although the court found that the defendant "receives regular cash gifts of up to $500 from at least one of his children," it is doubtful that those contributions will continue if the defendant no longer controls Greco's Auto Parts, Inc. Indeed, in its articulation, the court stated: "The inescapable conclusion in the instant case is that reserving voting control [in Greco's Auto Parts, Inc.] was the [defendant's] way of preserving control over his children in the event they did not do things his way." Furthermore, in his closing argument, the plaintiff's counsel stated in relevant part: "[The defendant's] income dramatically increased. . . . Your Honor, that doesn't happen because you're doing nothing, it happens because you have control, and it happens because you can impose your will on those around you to pay you those moneys.

\* \* \*

"[W]hen [the defendant] transferred his interest in the corporation [to his children], he didn't give them a controlling interest, he didn't give them all of it. I asked him why. He doesn't know. . . . But, I think I can draw a reasonable inference why he didn't, Your Honor. I think the reason he didn't was *because he had to have that control.* You don't get a $20,000 raise over two years when you're doing nothing because your children are being generous to you." (Emphasis added.)

[14] In its articulation, the court stated in relevant part: "It became abundantly clear to the court that while the [defendant] transferred virtually the entire equity in the business, he cunningly retained voting control. In the court's estimation, voting control of a small corporation is often more important than equity interest—such is the case in Greco's Auto Parts, Inc. Voting control has the ultimate power to elect directors, in effect elect officers, determine policy, set compensation, hire and fire employees, and in numerous other ways dictate the direction of the company. The inescapable conclusion in the instant case is that reserving voting control was the [defendant's] way of preserving control over his children in the event they did not do things his way."

$250,000, providing for interest of 7 percent per annum, payable monthly over a ten year period, with adequate security." Thus, the court's order transfers control of Greco's Auto Parts, Inc., to the plaintiff or, alternatively, requires the defendant to pay funds to the plaintiff, which, in light of the court's other orders and findings, he does not appear to have.[15]

The court's order, therefore, in effect, requires the defendant to transfer control of the closely held corporation to the plaintiff, which gives her control over the defendant's employment and his only significant source of income. Accordingly, the court's taking the corporation into account in both the property division and in the award of alimony and other payments is, in essence, "double dipping" and inequitable because the corporation provides the only significant stream of income by which the defendant can meet his alimony and other court ordered payment obligations. See *Dunleavy* v. *Dunleavy*, Superior Court, judicial district of Danbury, Docket No. 334546 (September 11, 2000); *Cardillo* v. *Cardillo*, Superior Court, judicial district of Stamford-Norwalk, Docket No. 114248 (June 10, 1992); see also *Krafick* v. *Krafick*, 234 Conn. 783, 804–805 n.26, 663 A.2d 365 (1995).

We conclude that the court incorrectly applied the law by basing its financial orders on the parties' gross incomes and that it abused its discretion by ordering the defendant to pay alimony and other expenses that far exceed his available net income.[16] We further con-

---

[15] The terms of the promissory note would require the defendant to pay to the plaintiff approximately an additional $34,832.52 per year for ten years.

[16] The plaintiff contends that the court's "award of alimony and insurance was reasonable in light of the [defendant's] underreported income" and that the court could have based its award on the defendant's earning capacity rather than on his actual net income. Although the court stated that the defendant's testimony frequently lacked credibility and his financial affidavit had to be amended several times during the trial to conform to the testimony, its memorandum of decision is devoid of any specific finding with respect to the defendant's alleged unreported income or his earning capacity. "This

clude that the court's award, in practical effect, equates to "double dipping" and, therefore, is inequitable. Accordingly, we reverse the judgment with respect to all the financial orders. See *Morris* v. *Morris*, supra, 262 Conn. 307; *Ludgin* v. *McGowan*, supra, 64 Conn. App. 359.

The judgment is reversed as to the financial orders only and the case is remanded for a new hearing on all financial issues in accordance with law.

court cannot find facts or draw conclusions from primary facts found, but can only review such findings to determine whether they could legally, logically and reasonably be found and whether the trial court could thereby conclude as it did." (Internal quotation marks omitted.) *Parkview Paving Co.* v. *New Haven*, 13 Conn. App. 574, 575, 537 A.2d 1049, cert. denied, 207 Conn. 810, 541 A.2d 1240 (1988). Accordingly, the plaintiff's contention is without merit.