## SHARON LOUGHLIN v. WILLIAM LOUGHLIN, JR.
### (AC 25611)

Lavery, C. J., and Gruendel and Peters, Js.

Argued September 27, 2005—officially released February 7, 2006

*William F. Gallagher*, with whom, on the brief, were *Hugh D. Hughes* and *Jacqueline F. Barbara*, for the appellant (defendant).

*Jeffrey D. Ginzberg*, for the appellee (defendant).

*Opinion*

LAVERY, C. J. The defendant, William Loughlin, Jr., appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Sharon Loughlin, and claims that certain of the court's financial orders were improper. He argues that the court improperly (1) relied on the length of the parties' entire relationship, rather than that of the marriage at issue,[1] in violation of General Statutes §§ 46b-81 and 46b-82, (2) considered the needs of the parties' adult children and a grandchild when fashioning its award of alimony to the plaintiff, and (3) ordered that the defendant pay a portion of the plaintiff's attorney's fees. We agree that the court relied on improper considerations in crafting its financial orders and, accordingly, reverse the judgment.[2]

The following facts and procedural history are relevant. The parties initially were married from 1981 to 1992. Their three children were born during that marriage.[3] Within a year or so of the 1992 divorce, the parties resumed cohabiting. In 1998, they remarried. The judgment of dissolution that is the subject of this appeal was rendered in 2004. At that time, the parties'

---

[1] The parties previously were married to one another and divorced. This case concerns the dissolution of their second marriage to each other.

[2] In light of our disposition of the defendant's first and second claims, which involve the court's orders regarding property distribution and alimony, we do not reach his third claim relating to attorney's fees. Because we conclude that remand of the case is necessary for a reconsideration of all financial orders, it is entirely possible that a different order as to attorney's fees will result.

[3] The eldest child, a daughter, was born on January 1, 1982, the middle child, a daughter, on August 29, 1983, and the youngest child, a son, on December 4, 1987.

children were twenty-two, twenty and sixteen years old. The middle child, who was unmarried, recently had become a mother.

During the period of time that the parties were cohabiting but unmarried, the plaintiff attended nursing school, receiving an associate's degree in 1996. Thereafter, she worked in various nursing positions. The defendant also pursued his education at that time, completing a bachelor's degree primarily between 1993 and 1998 and, subsequently, a master's degree. He began working at Sikorsky Aircraft Corporation in 1986 and remained with that employer through the time of the second divorce. In 2000, the parties purchased a house for $315,000.[4] In 2001, the defendant accepted an assignment from his employer that required him to live in Turkey. After his departure, the parties grew apart and, in October, 2003, the plaintiff filed for divorce.

A hearing was held on June 9 and 10, 2004, at which each of the parties testified. At the time of the hearing, the plaintiff was forty years old and the defendant was forty-three. The plaintiff's annual full-time salary was determined to be $52,676 and the defendant's, $153,495.[5] The parties were in partial agreement as to the terms of a proposed property division and financial orders. They disagreed, however, as to the specifics of an alimony award, particularly as to its term, and to the distribution of the marital residence and the defendant's retirement accounts. The defendant was willing to pay alimony for two and one-half years, while the plaintiff

---

[4] The parties financed the purchase, in part, with a fifteen year mortgage loan. At the time of the dissolution proceedings, the monthly mortgage payments were approximately $2700. The parties stipulated that the house then was worth $390,000.

[5] Although the plaintiff at the time of trial was working thirty-two hours weekly, extra hours were available to her. The defendant's salary consisted of approximately $93,000 base pay plus various increases to which he was entitled for working abroad, as well as income imputed to him for his housing and other expenses paid by his employer while he was in Turkey.

requested a permanent award. With respect to the residence, the defendant was willing to transfer his interest therein to the plaintiff in exchange for $60,500. As to his retirement accounts, he submitted that only the amounts accrued during the second marriage were at issue and requested that they be awarded to him in full. The plaintiff requested the residence outright and 50 percent of the entire value of the defendant's retirement accounts.

The court rendered an oral decision at the conclusion of the hearing and, thereafter, reduced its judgment to writing.[6] Pursuant to the court's judgment, the parties were awarded joint legal custody of their one minor child, the sixteen year old son. The son's primary residence was to be with the plaintiff, and the defendant was ordered to pay $272 weekly in child support and provide for the son's health insurance.[7]

With respect to the distribution of the parties' assets and liabilities, the defendant was ordered to transfer his interest in the marital home, and all of its contents, to the plaintiff,[8] and the defendant was awarded the entirety of his 401 (k) retirement account.[9] The court considered the equity in the home and the value of the defendant's 401 (k) to be roughly equal.[10] The defendant was to assume responsibility for payment of the elder daughter's student loan and to pay for the entirety of

---

[6] A copy of the transcript of the court's remarks was signed by the trial judge and submitted to this court on appeal as an oral decision. See Practice Book § 64-1 (a).

[7] The defendant was awarded the right to take the federal income tax exemption for the son.

[8] The plaintiff also was awarded the right to claim the mortgage interest and property tax deductions for federal income tax purposes.

[9] In the event of the defendant's death, the three children were to be named the beneficiaries of the 401 (k) death benefit until they reached the age of twenty-three.

[10] The plaintiff's affidavit valued the equity at $137,000, and the defendant's affidavit valued it at $161,761. The defendant's 401 (k) balance was $127,042.

the son's college education.[11] The parties were to divide equally the expenses of the younger daughter's attendance at a community college.[12] The defendant also was to repay the younger daughter's automobile loan.[13] The defendant additionally was to convey to the plaintiff, by way of a qualified domestic relations order, 50 percent of the current value of his pension, which had accrued over the whole of his employment at Sikorsky Aircraft Corporation.[14] Finally, the court ordered him to pay $7500 of the plaintiff's attorney's fees, which totaled $10,000. The plaintiff was to be responsible for her own car loan[15] and a credit card account.[16]

With respect to alimony, the court ordered the defendant to pay the plaintiff $600 weekly for twelve years. The court explained that it set the alimony rate at an amount that essentially would cover the mortgage payment on the marital home and set its term for the amount of time left on the mortgage.[17] It specified that the duration of the alimony would be nonmodifiable by either party. The court further ordered the defendant

[11] The student loan balance was approximately $35,500. The elder daughter recently had finished college and was planning to attend graduate school. The son was in his junior year of high school.

[12] The younger daughter had given birth two weeks prior to the hearing and was living with the plaintiff.

[13] The balance of the daughter's automobile loan was approximately $6700. At trial, the defendant agreed voluntarily to take responsibility for that loan, and for his children's educational debt and expenses as stated herein.

[14] The present value of the pension at the time of the hearing was $92,047. The parties' son was to be named the beneficiary of the pension, in the event of the defendant's death, until the son reached the age of twenty-three.

[15] The balance of the plaintiff's automobile loan was $15,500.

[16] According to the plaintiff's financial affidavit, the credit card account did not have a balance.

[17] The court stated: "[T]he reason I'm making it $600 a week alimony is because that's basically what it's going to cost for the—between the taxes and insurance—excuse me, taxes and the mortgage. Now, the question is, how long? And I'm going to say twelve years. All right? Because it's roughly twelve years when that will be paid off. . . . That's the length of the mortgage [loan] on the house."

to obtain life insurance, initially naming the children as beneficiaries and then, once the children reached the age of twenty-three, naming the plaintiff as beneficiary for the duration of the alimony obligation and in a declining amount equal to the remaining alimony payments.

The defendant thereafter filed motions to reargue and for articulation. In his motion to reargue, he took issue with the term of the alimony award, his failure to receive any interest in the marital residence, the awarding of one half of his pension to the plaintiff and the requirement that he pay a portion of her attorney's fees. A hearing on the motions was held on June 29, 2004, at which the court further articulated some of the reasoning underlying its orders. The court also issued a written articulation on September 30, 2004. This appeal followed.

At the outset, we note the standard of review governing the defendant's claims. "We review financial awards in dissolution actions under an abuse of discretion standard. . . . In order to conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Citation omitted; internal quotation marks omitted.) *Greco* v. *Greco*, 82 Conn. App. 768, 772, 847 A.2d 1017 (2004), aff'd, 275 Conn. 348, 880 A.2d 872 (2005). To the extent that the defendant's claims require us to interpret the statutes governing dissolution of marriage, however, our review is plenary. See *Robinson* v. *Robinson*, 86 Conn. App. 719, 724, 862 A.2d 326 (2004). We now turn to the issues on appeal. Additional facts will be provided where pertinent.

I

The defendant claims first that, in fashioning its financial orders, the court improperly relied on the total length of the parties' relationship rather than on the length of their second marriage only, in violation of §§ 46b-81 and 46b-82. We agree.

A trial court in a dissolution action, when dividing the parties' property and determining whether, or how much of, an alimony award is warranted, is guided by factors enumerated in §§ 46b-81 and 46b-82, respectively. Both statutes provide for the court's consideration of "*the length of the marriage,* the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties . . . ." (Emphasis added.) General Statutes § 46b-82 (a); see also General Statutes § 46b-81 (c). Section 46b-81 further directs the court, when effecting a property distribution, to consider the parties' liabilities, their opportunities for future acquisition of capital assets and income and their contributions toward their respective estates. General Statutes § 46-81 (c). Section 46b-82 provides additionally that the court, when considering alimony, should take into account the orders it made pursuant to § 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment. General Statutes § 46b-82 (a). For both statutes, however, the specified criteria are not exhaustive, and the court properly may consider other equitable factors when crafting its property distribution and alimony orders. See *Robinson* v. *Robinson,* 187 Conn. 70, 72, 444 A.2d 234 (1982); *Demartino* v. *Demartino,* 79 Conn. App. 488, 500, 830 A.2d 394 (2003).

The defendant claims that the court here, in fashioning its orders, improperly relied on the total length of

the parties' relationship rather than on the "length of the marriage" as contemplated by the statutes. According to the defendant, the total length of the parties' relationship was "a critical factor" underlying the court's decision to award twelve years of alimony and that consideration was not one authorized by §§ 46b-81 or 46b-82.[18] He argues that the court's approach "effectively recognize[d] cohabitation as a marital status."

The following additional facts and procedural history are pertinent to the claim. When testifying at the June 9, 2004 hearing, the plaintiff stated that during the time the parties lived together but were not married, she and the defendant lived like husband and wife. She testified that she thought the court should look at the marriage as longer than six years because she and the defendant had "been together for almost twenty-three years." According to the plaintiff, during the six year period between the two marriages, "even though [she and the defendant] weren't remarried, [they] acted as if [they] were married."[19]

The court apparently found this testimony persuasive, as evidenced by remarks it made at several junctures in the proceedings. To begin, it prefaced its oral pronouncement of the alimony award with the following comment: "Well, first of all, obviously we go back to 1981 in some respects . . . it's a long-term relationship which maybe . . . should have been severed permanently but it wasn't, and here we are back again."

[18] Although the defendant's argument focuses on the alimony award, insofar as he relies on both §§ 46b-81 and 46b-82, we construe it also as contesting the property distribution. Further, it is clear that in this case, the order regarding alimony related directly to the order regarding ownership of the marital residence.

[19] A number of photographs depicting the parties and their children engaged in various vacation and holiday activities, taken between 1992 and 1998, were introduced into evidence by the plaintiff, presumably to prove that point.

Thereafter, at the June 29, 2004 hearing on the defendant's motions to reargue and for articulation, the court explained that in fashioning its orders, it had "considered the totality of their relationships." It elaborated further that it "saw [the plaintiff] from sixteen years old [and that she and the defendant had] stayed together all those years." The court reiterated, "It goes back to sixteen years old, unfortunately. Right."

Finally, in its September 30, 2004 written articulation, the court noted that "[t]he plaintiff helped support the family while the defendant earned a bachelor's [degree] and master's degree at night," events that occurred in substantial part during the parties' period of unmarried cohabitation. It again stated explicitly that it "considered the totality of the relationship between the parties." The court noted that "[t]he plaintiff had devoted almost twenty-four years to the relationship" and stated in conclusion that it "did not feel constrained in its decision by the length of the second marriage, which lasted from [1998] to 2004. . . . The plaintiff was awarded alimony for twelve years nonmodifiable as to the term so that she would be able to live in the family home until the mortgage [loan] was paid in full." It is clear from the foregoing comments that the court, in fashioning its financial orders, considered not only the six year marriage, which was the subject of the current dissolution action, but also the parties' six years of unmarried cohabitation and, further, their initial eleven year marriage, the dissolution of which was adjudicated in a previous action.

To begin, pursuant to the unambiguous language employed in §§ 46b-81 (c) and 46b-82 (a), the statutory factor of "length of the marriage" contemplates only the marriage presently being dissolved. "Marriage" repeatedly is referred to in the singular and, moreover, it is unlikely that the drafters of the statutes, when compiling lists of considerations for courts to weigh,

had in mind the unusual circumstance of serial marriages between the same parties. As to cohabitation, it cannot reasonably be argued that that living arrangement is encompassed within the plain meaning of "marriage." Because "prior marriages of the parties" and "cohabitation prior to marriage" are not factors specifically enumerated in § 46b-82 (a), the question thus presented is whether the court here properly took into account the parties' entire relationship history as an additional equitable consideration. See *Robinson* v. *Robinson*, supra, 187 Conn. 72; *Demartino* v. *Demartino*, supra, 79 Conn. App. 500.

When the parties first were divorced in 1992, they reassumed the legal status of two single people, regardless of their intentions. See General Statutes 46b-67 (b) ("decree of . . . dissolution shall give the parties the status of unmarried persons"); see also *Hames* v. *Hames*, 163 Conn. 588, 594, 316 A.2d 379 (1972) ("[i]n the eyes of the law . . . a divorced pair could be but two single persons desirous of acquiring marital status"). The fact that they soon recommenced living together did nothing to alter that status.

With respect to the effect of cohabitation by those who hold themselves out as husband and wife, the law of this jurisdiction is clear. "Although other jurisdictions may recognize common-law marriage or accord legal consequences to informal marriage relationships, Connecticut definitely does not. . . . It follows that although two persons cohabit and conduct themselves as a married couple, our law neither grants to nor imposes upon them marital status." (Citations omitted.) *McAnerney* v. *McAnerney*, 165 Conn. 277, 285, 334 A.2d 437 (1973); see also *Hames* v. *Hames*, supra, 163 Conn. 592–93, 597; *State ex rel. Felson* v. *Allen*, 129 Conn. 427, 432, 29 A.2d 306 (1942). "The rights and obligations that attend a valid marriage simply do not arise where the parties choose to cohabit outside the marital relation-

ship." *Boland* v. *Catalano*, 202 Conn. 333, 339, 521 A.2d 142 (1987).

Consistent with those principles, property and support disputes between unmarried cohabitants must be resolved by means outside the statutory scheme for dissolution of marriages, typically, under general contract principles. See, e.g., id.; *Herring* v. *Daniels*, 70 Conn. App. 649, 805 A.2d 718 (2002); see also 6 A. Rutkin, Family Law & Practice (2005) § 65.03 [1] [a] ("[C]ohabitation in and of itself does not create any support obligation for either party. Any 'support' obligation must arise from the terms of a cohabitation agreement."). The property rights of cohabitants "are not based on the equitable distribution provisions of the marriage and divorce laws because the judicial recognition of mutual property rights between unmarried cohabitants would violate the policy of the state to strengthen and preserve the integrity of marriage, as demonstrated by its abolition of common-law marriage." 24 Am. Jur. 2d 644–45, Divorce & Separation § 494 (1998).

In *Gurliacci* v. *Mayer*, 218 Conn. 531, 562–64, 590 A.2d 914 (1991), our Supreme Court, like courts in most other jurisdictions, refused to recognize a husband's lost consortium claim, which was based on an injury to his wife that occurred prior to the couple's marriage. The court explained the rationale for the marital relation requirement, noting that it "form[ed] the necessary touchstone to determine the strength of commitment between the two individuals which gives rise to the existence of consortium between them in the first instance." Id., 564. The requisite level of commitment thus could not be presumed from cohabitation alone.

In *Eisenbaum* v. *Eisenbaum*, 44 Conn. App. 605, 691 A.2d 25 (1997), we had occasion to address indirectly the question of whether the statutory authorization for

alimony was applicable to cohabitants with a history of marriage. In *Eisenbaum*, a previously married and divorced couple resumed cohabitating and, thereafter, had two children together. Id., 606. The parties then separated, and the plaintiff brought an action seeking child support and custody.[20] Id., 607. The defendant appealed from a pendente lite order requiring that he pay certain household expenses, arguing that the order was not for child support but, rather, disguised alimony. Id., 607–608. This court upheld the order, but only in part. Specifically, we sustained the order only to the extent that the trial court's characterization thereof, as "in kind child support," was consistent with the evidence. With respect to a credit card bill, we concluded that the court had no authority to order its payment under the guise of child support, because there was no evidence that such payment was necessary for the maintenance of the children. Id., 609. Implicit in that holding was a rejection of the notion that cohabitants who were once married to each other and who later separate may be held responsible for, or entitled to, payments in the nature of spousal support.

The foregoing cases evince a policy of Connecticut's courts to draw a clear distinction between marriage and mere cohabitation, even when that cohabitation was preceded by, or ultimately led to, a marital relationship. Pursuant to that policy, parties who have made the formal commitment of marriage are afforded greater rights and protections than those who choose to reside together informally. Given that policy, it would be incongruous to conclude that a court, when entering financial orders pursuant to §§ 46b-81 and 46b-82, may take into account a period of premarital cohabitation as an additional equitable consideration. Accordingly, the court's consideration here of the parties' six years

---

[20] Parents have an independent duty to support their minor children, regardless of whether the parents are married.

of cohabitation was improper. We note that courts of our sister states, in like contexts, have concluded similarly. See, e.g., *In re Marriage of Bukaty*, 180 Cal. App. 3d 143, 149, 225 Cal. Rptr. 492 (1986) (concluding that court in making limited support award properly refused to consider parties' lengthy period of premarital cohabitation); *Murray* v. *Murray*, 374 So. 2d 622, 623 (Fla. App. 1979) (noting that marriage was of short duration and that parties' cohabitation for several years prior did not provide proper basis for award of rehabilitative alimony); *In re Marriage of Goldstein*, 97 Ill. App. 3d 1023, 1028, 423 N.E.2d 1201 (1981) (holding evidence of parties' premarital cohabitation, including showing wife's support of husband while he attained medical degree, properly excluded in dissolution proceedings); but see *In re Matter of Long*, 159 Or. App. 471, 475, 978 P.2d 410 (1999) (courts in some cases may consider entire length of relationship, including period of cohabitation preceding marriage), review denied, 329 Or. 589, 994 P.2d 130 (2000).

The question of whether the court, in shaping its financial orders, properly considered the parties' first marriage is a closer one. We conclude, however, that consideration of the earlier marriage in the parties' second dissolution action also was improper.

First, as previously explained, the plain language of §§ 46b-81(c) and 46b-82 (a) directs a court in a dissolution action to consider the length of only the marriage presently being dissolved and does not contemplate the consideration of any previous marital relations between the parties. Second, the parties' first marriage already had been the subject of an earlier dissolution action, and allowing the matter litigated therein to be revisited twelve years later would run counter to our policy favoring "finality of litigation and stability of judgments . . . ." *Billington* v. *Billington*, 220 Conn. 212, 222, 595 A.2d 1377 (1991); cf. 24 Am. Jur. 2d 572–73, supra, § 411

("The doctrine [of res judicata] is fully applicable to judgments and decrees entered in an action for a divorce . . . . Thus, a final decree of divorce is res judicata with respect to all issues which were, or could have been, litigated in the proceeding."). Finally, we find guidance in decisions of our sister courts declining, in dissolution matters involving serial marriages, to view those marriages in the aggregate. See *In re Marriage of Bukaty*, supra, 180 Cal. App. 3d 147–50 (deciding that court in parties' second divorce action properly refused to consider parties' first marriage in weighing statutory factor of duration of marriage); *Wooldridge* v. *Wooldridge*, 791 A.2d 107, 108 (Me. 2002) (concluding that remarriage of parties did not reestablish as marital property what had been awarded to parties separately in first divorce); *Hildebrand* v. *Hildebrand*, 239 Neb. 605, 613–14, 477 N.W.2d 1 (1991) (holding that upon parties' second divorce, wife entitled only to portion of husband's pension that accrued during second marriage); *Henderson* v. *Henderson*, 764 P.2d 156, 159 (Okla. 1988) (concluding that court, in determining property distribution in parties' third divorce, properly refused to view their relationship as one continuous marriage from date of first marriage). On the basis of the foregoing analysis, we conclude that the court improperly considered the length of the parties' entire relationship, rather than the marriage at issue, in crafting its financial orders.

## II

The defendant argues next that in fashioning the award of alimony, the court improperly relied on the presence of the parties' adult children and grandchild in the house, which the alimony was designed to secure to the plaintiff. According to the defendant, the court effectively ordered the payment of unauthorized, postmajority child support. Again, we agree.[21]

---

[21] Although we concluded in part I that the court abused its discretion by considering the entire length of the parties' relationship in fashioning its

The following additional facts are relevant to the claim. When the plaintiff testified on June 9, 2004, she explained why she thought it fair that she be awarded the marital residence. According to the plaintiff, "I need a place for the kids and I to live. They miss—they look forward—[the elder daughter] looks forward to coming home. I give them a sense of security and a place of—a place to come to. They—that's what they've expressed to me . . . ." On cross-examination, she reiterated her belief that it was fair for her to get the house and, when the defendant's counsel then noted that two of the children were adults, she replied, "Yes, they're adults, but they're still my children."

During their closing arguments, counsel for the parties addressed the matter of what would be a proper term for an alimony award. At one point, the court suggested to the plaintiff's counsel, "Why don't you argue [that] obviously the house is a help for the children. I guess I'm telling you too many things. . . . But would—how—would she be able to handle the house if she only got six years of alimony?" When the defendant's counsel argued that alimony should be limited, noting that the defendant would have no house or furnishings when he returned from Turkey, the court responded that "I also have to think about three children." When the defendant's counsel observed that the two older children were twenty and twenty-two, and that the only minor child would be graduating soon from high school, the court replied, "They still need a place, though," and remarked further that the younger daughter "has special needs right now."

When setting the amount of alimony, the court made it clear that its decision was based on the amount of

financial orders such that a new hearing is required, we nevertheless address the defendant's second claim because it raises a legal issue likely to arise on remand. See *Gervais* v. *Gervais*, 91 Conn. App. 840, 849, 882 A.2d 731 (2005).

the mortgage payments and the time left on the mortgage loan. See footnote 17. In making some closing comments to the parties, the court stated that the plaintiff, as a result of the property distribution and financial orders, "has a house for the kids to be at, and that's important. No matter how old they are, they have to have a house to come home to."

At the September 29, 2004 hearing on the defendant's motions to reargue and for articulation, the court explained further that the plaintiff "still has a family in need" and that "the children are still being educated," and it indicated that it had taken those considerations into account when fashioning the award. In its September 30, 2004 written articulation, the court stated that "[t]he mortgage on the family home had an additional twelve years, which the plaintiff could ill afford to pay on her own salary. Also, this family home was the residence of the minor child, two adult children and a grandchild."

According to the defendant, the court's articulated rationale for the alimony order demonstrates that alimony was awarded for an improper purpose, namely, for postmajority child support in the form of housing. He argues that the court's reliance on the needs of his adult children and grandchild was an abuse of discretion. We agree.

We start with general principles. "Alimony is payment for support of a former spouse and child support is payment for support of a minor child." *Wolfburg* v. *Wolfburg*, 27 Conn. App. 396, 402, 606 A.2d 48 (1992); see also 24A Am. Jur. 2d, Divorce & Separation § 608 (1998) ("sole object of alimony is the provision of food, clothing, habitation, and other necessaries *for the support of a spouse*" [emphasis added]). "[T]he two must be kept separate when the court determines the appropriate awards as to each . . . ." (Citation omitted.)

*Wolfburg* v. *Wolfburg,* supra, 402. A reviewing court is not necessarily bound by the trial court's characterization of a financial order in a dissolution action when evaluating the order's propriety. See, e.g., *Brown* v. *Brown,* 190 Conn. 345, 349, 460 A.2d 1287 (1983) (concluding that disproportionately high child support award was, in reality, disguised alimony for custodial parent, who was supporting her adult daughter in addition to minor child for whom support had been ordered).

As a general matter, "[t]he obligation of a parent to support a child terminates when the child attains the age of majority, which, in this state, is eighteen. General Statutes § 1-1d; *Kennedy* v. *Kennedy,* 177 Conn. 47, 52, 411 A.2d 25 (1979); *Sillman* v. *Sillman,* 168 Conn. 144, 358 A.2d 150 (1975). The statutory grant of jurisdiction to the Superior Court in matters relating to child support incident to the dissolution of a marriage[22] likewise expressly circumscribes the court's jurisdiction to orders involving only minor children." (Internal quotation marks omitted.) *Cariseo* v. *Cariseo,* 190 Conn. 141, 142–43, 459 A.2d 523 (1983).[23]

Additional statutory provisions may apply, however, to modify this general rule. Pursuant to General Statutes

---

[22] See General Statutes § 46b-84.

[23] Applying that principle, Connecticut's appellate courts have invalidated orders of trial courts that directly or indirectly provided for support of adult children and, therefore, were in excess of those courts' jurisdiction. See *Broaca* v. *Broaca,* 181 Conn. 463, 435 A.2d 1016 (1980) (court lacked jurisdiction to order defendant to name children as irrevocable beneficiaries of life insurance); *Keeys* v. *Keeys,* 43 Conn. App. 575, 576–77, 684 A.2d 1214 (1996) (court lacked jurisdiction to order defendant to provide medical, dental insurance and pay one half of unreimbursed medical, dental expenses for adult child); *Louney* v. *Louney,* 13 Conn. App. 270, 274–75, 535 A.2d 1318 (1988) (court exceeded authority in restricting mother's use of funds in joint account to payment of adult daughter's educational expenses); *Zering* v. *Zering,* 5 Conn. App. 249, 252–53, 497 A.2d 1023 (1985) (if children were not irrevocable beneficiaries of savings trust, court improperly awarded it to mother with limitation that it be used for their postmajority educational expenses).

§ 46b-66 (a), a court in a dissolution proceeding may enter an order providing for postmajority child support when the parties have agreed in writing to the terms of that order.[24] Under a more recently enacted provision, upon motion of a party and after making certain subsidiary findings, a court may issue an educational support order for college age children.[25] See General Statutes § 46b-56c (b), (c), (e); see also *Robinson* v. *Robinson*, supra, 86 Conn. App. 725. Such an order may require one or both parties to a dissolution action to provide support to a child, until the child reaches the age of twenty-three, for certain enumerated educational expenses.[26] In the absence of a statute or agreement providing for postmajority assistance, however, a parent ordinarily is under no legal obligation to support an adult child. We note here that because the court did not make its orders on the basis of a written agreement of the parties, nor did it adhere to the statutory procedure dictated for an educational support order; see footnotes 24 and 25; General Statutes §§ 46b-66 (a) and 46b-56c are not implicated.

Under certain circumstances, the economic impact on an alimony recipient of caring for a *minor* child may

[24] A written agreement is mandatory, serving to confer jurisdiction on the court; *Lowe* v. *Lowe*, 47 Conn. App. 354, 357, 704 A.2d 236 (1997); and oral stipulations, thus, do not qualify. *Arseniadis* v. *Arseniadis*, 2 Conn. App. 239, 246, 477 A.2d 152 (1984). We observe that in this case, there is no indication that the parties executed a written agreement providing for their children's postmajority support.

[25] In this case, although the court in its judgment cited Public Acts 2002, No. 02-128, now codified as General Statutes § 46b-56c, as the basis for its continuing jurisdiction over the issue of educational support, it does not appear that either party filed a motion for an educational support order. Furthermore, the court did not make the factual findings mandated by the statute.

[26] The court's order is prescribed by the terms of the statute. The court may not order support for expenses not listed. See *Kelman* v. *Kelman*, 86 Conn. App. 120, 125–26, 860 A.2d 292 (2004), cert. denied, 273 Conn. 911, 870 A.2d 1079 (2005).

be a proper consideration for the court when setting the term of alimony. *Wolfburg* v. *Wolfburg,* supra, 27 Conn. App. 396.[27] In *Hopfer* v. *Hopfer,* 59 Conn. App. 452, 757 A.2d 673 (2000), however, we held that the court, in calculating an alimony award, properly excluded any evidence regarding the postmajority expenses of the parties' two children. Id., 460–61. We rejected the recipient's argument that the § 46b-82 factor of "station" "refers to the lifestyle or standard of living of the parties during the marriage, *including their commensurate expectations for the education and advancement of their children."* (Emphasis added.) Id., 461; see also 24A Am. Jur. 2d 218, supra, § 837 ("court may not order an increase in alimony based on the recipient spouse's need for funds to pay for a college education for the couple's postmajority-aged children . . . because to do so is an indirect method of compelling unwilling divorced parents to provide college costs for their capable adult children").

Relatedly, in *Cariseo* v. *Cariseo,* supra, 190 Conn. 141, an alimony recipient sought an upward modification based in part on her increased expenses, which she attributed partially to the circumstance that two of the parties' adult children were living with her and attending college. Id., 142. The trial court ordered the relief sought, reasoning that although the children "had attained their majority, the mother was still feeding them and providing a roof over their heads and . . . it was disproportionate to have her bear the burden of maintaining [them]." Id. Our Supreme Court reversed the court's order, holding that "financial obligations

---

[27] In *Wolfburg,* this court concluded that an alimony award coextensive with the remainder of the minority of the parties' child was proper because there was evidence that during their marriage, the parties had agreed that the recipient would "shape the time spent in a career or employment to the needs of the family during the minority of the child . . . ." *Wolfburg* v. *Wolfburg,* supra, 27 Conn. App. 401–402. We rejected the appellant payor's claim that the award was disguised additional child support. Id., 400.

arising out of a parent's maintenance of adult children in the family home while they are attending college" was not a substantial change in circumstances on which a modification of alimony properly could be predicated. Id., 143. Although the factors underlying an initial alimony award differ from the standard for a modification, the court's holding lends support to the notion that adult children's needs are not a proper basis for alimony payments.

Our research of decisions in other jurisdictions has revealed several cases in which awards of spousal support were invalidated due to indications that they were intended to provide continuing assistance to adult children. In *Lesko* v. *Lesko*, 184 Mich. App. 395, 405, 457 N.W.2d 695 (1990), the Michigan Court of Appeals held that a trial court, when awarding alimony, improperly considered the recipient's voluntary assumption of the payment of living expenses for adult children residing with her, explaining that it was "declin[ing] to allow a court to order support for adult children through the back door by alimony where it cannot order it through the front door by child support." In *Laporte* v. *Howell*, 452 So. 2d 420 (La. App. 1984), the Court of Appeal of Louisiana affirmed an order terminating alimony payments where the recipient admitted that her expenses included substantial contributions to the support of two adult children. The court stated that "[t]he needs of major children should have no influence in determining a spouse's need for alimony." Id., 422. In *Wobser* v. *Wobser*, 91 App. Div. 2d 826, 458 N.Y.S.2d 113 (1982), the Appellate Division of the Supreme Court of New York held improper the award of exclusive possession of the marital home to the wife when the children residing there were grown. The court stated that the "husband should not be compelled to subsidize his adult children by providing living quarters for them." Id., 827; see also *Thomas* v. *Thomas*, 427 So. 2d 259, 260 (Fla.

App. 1983) (holding award of exclusive possession of marital home while children attended college improper postmajority child support); *Patterson* v. *Patterson*, 288 S.C. 282, 286–87, 341 S.E.2d 819 (App. 1986) (same).

Similar considerations apply to grandchildren, for whom their grandparents have no legal duty of support, even where the parent of the grandchild is still a minor. See 3 A. Rutkin, Family Law & Practice, supra, § 33.02 [3] [g]. In *Nichols* v. *Nichols*, 14 S.W.3d 630 (Mo. App. 2000), the Missouri Court of Appeals held that the expenses and care of the parties' grandchildren could not properly be considered in a trial court's determination of whether the spouse with whom the grandchildren resided was in need of maintenance. Id., 637–38. The court allowed that the payor spouse might have a moral responsibility toward his grandchildren but concluded that he was not legally responsible for their support. Id., 637; see also *Baker* v. *Baker*, 866 P.2d 540, 545–46 (Utah 1993) (holding similarly).

Guided by the foregoing, we conclude that the court's award of alimony was improper because it was ordered on the basis of illegal considerations, specifically, on the needs of the parties' adult children and grandchild. The court's comments on the record and in its articulation indicate that the alimony award was meant to ensure that the plaintiff retain the marital home. Although it generally is acceptable for a court to set the term of time limited alimony to expire with some future event, such as the maturation of a mortgage loan; see *Henin* v. *Henin*, 26 Conn. App. 386, 392–93, 601 A.2d 550 (1992); the court here went much further by opining repeatedly that the reason the plaintiff ought to have the house, and whatever support was necessary to retain it, was the ongoing needs of her adult children, and grandchild, to have a place to live.

The plaintiff suggests that even if this court should find error in the court's rulings, its judgment should

remain intact because, due to the wide discretion afforded to a court in a dissolution action, any improper considerations were harmless. We are not convinced. "The defendant is entitled to relief from the court's improper rulings only if one or more of those rulings were harmful." *Berry* v. *Berry*, 88 Conn. App. 674, 678, 870 A.2d 1161 (2005). "To meet this burden in a civil case, the appellant must show that the ruling would likely affect the result." (Internal quotation marks omitted.) *Tevolini* v. *Tevolini*, 66 Conn. App. 16, 31, 783 A.2d 1157 (2001).

We recognize that, as a general matter, a court may order alimony for whatever term it considers equitable and that the court enjoys broad leeway in this regard. Here, however, it is abundantly clear that the court, when weighing the statutory factors of the length of the marriage and the needs of the parties, relied heavily on considerations outside the statutory framework, namely, the length of the parties' entire relationship and the needs of their adult children and grandchild. Cf. id., 31 (court's improper exclusion of evidence pertaining to alimony recipient's health not harmless because health is material factor under § 46b-82). The court's repeated statements that those considerations underpinned its orders convinces us that, had it been clear to the court that its rationale was improper, the result likely would have differed.

"We are acutely aware that trial courts have wide discretion to formulate remedies in domestic relations cases, and . . . [that] [t]he power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. Without this wide discretion and broad equitable power, the courts in some cases might be unable fairly to resolve the parties' dispute . . . . Nevertheless, when invoking principles of equity, a court must examine both the public policy

implicated and the basic elements of fairness." (Citation omitted; internal quotation marks omitted.) *Greco* v. *Greco*, 275 Conn. 348, 362, 880 A.2d 872 (2005). Here, the court's orders were contrary to the policy of Connecticut to treat marriage and cohabitation differently, and were unfair to the extent that they required the defendant to support his adult children absent statutory authorization or written agreement of the parties.

"[W]hen a portion of the court's financial order is found to be flawed, we return the matter to the trial court for a new hearing on the ground that in marital dissolution jurisprudence, financial orders often are interwoven." (Internal quotation marks omitted.) *Gervais* v. *Gervais*, 91 Conn. App. 840, 848, 882 A.2d 731 (2005). "The rendering of judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." (Internal quotation marks omitted.) Id. Accordingly, the judgment must be reversed except for the granting of the dissolution of marriage and the awarding of custody of the minor child.

The judgment is reversed as to the property and financial awards only and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.