SHARON LOUGHLIN *v.* WILLIAM LOUGHLIN, JR.
(SC 17634)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 19—officially released December 12, 2006

*Jeffrey D. Ginzberg,* for the appellant (plaintiff).

*William F. Gallagher,* with whom, on the brief, were *Hugh D. Hughes* and *Jacqueline F. Barbara,* for the appellee (defendant).

*Opinion*

KATZ, J. The plaintiff, Sharon Loughlin, appeals from the judgment of the Appellate Court reversing in part the judgment of the trial court on the ground that the trial court relied on impermissible factors in crafting

its financial orders under General Statutes §§ 46b-81[1] and 46b-82,[2] pursuant to the dissolution of her marriage to the defendant, William Loughlin, Jr. *Loughlin* v. *Loughlin*, 93 Conn. App. 618, 889 A.2d 902 (2006). We granted the plaintiff's petition for certification to appeal limited to the following two issues: "(1) Did the Appel-

---

[1] General Statutes § 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint under section 46b-45, the Superior Court may assign to either the husband or wife all or any part of the estate of the other. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either the husband or the wife, when in the judgment of the court it is the proper mode to carry the decree into effect. . . .

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

[2] General Statutes § 46b-82 (a) provides: "At the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other, in addition to or in lieu of an award pursuant to section 46b-81. The order may direct that security be given therefor on such terms as the court may deem desirable, including an order pursuant to subsection (b) of this section or an order to either party to contract with a third party for periodic payments or payments contingent on a life to the other party. The court may order that a party obtain life insurance as such security unless such party proves, by a preponderance of the evidence, that such insurance is not available to such party, such party is unable to pay the cost of such insurance or such party is uninsurable. In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall hear the witnesses, if any, of each party, except as provided in subsection (a) of section 46b-51, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment."

late Court properly conclude that the trial court had improperly relied on the total length of the parties' relationship[3] in fashioning its financial orders? (2) Did the Appellate Court properly conclude that the trial court had improperly relied on the presence of the parties' adult children and grandchild in the home in fashioning its alimony reward?" *Loughlin* v. *Loughlin*, 277 Conn. 926, 895 A.2d 798 (2006). We affirm the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the following undisputed facts and procedural history relevant to this appeal. "The parties initially were married from 1981 to 1992. Their three children were born during that marriage. Within a year or so of the 1992 divorce, the parties resumed cohabiting. In 1998, they remarried. The judgment of dissolution that is the subject of this appeal was rendered in 2004. At that time, the parties' [eldest daughter, Elizabeth Loughlin, was] twenty-two, [their middle child, Kathryn Loughlin, was] twenty and [their son, Kevin Loughlin, was] sixteen years old. [Kathryn Loughlin], who was unmarried, recently had become a mother." *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 620–21. At the time of the second dissolution proceedings, the parties' two youngest children and their grandchild were living in the family home with the plaintiff.

"During the period of time that the parties were cohabiting but unmarried, the plaintiff attended nursing school, receiving an associate's degree in 1996. Thereafter, she worked in various nursing positions. The defendant also pursued his education at that time, completing a bachelor's degree primarily between 1993 and 1998 and, subsequently, a master's degree. He began

---

[3] The present appeal concerns the dissolution judgment relating to the parties' second marriage to each other. The parties previously had been married and divorced, and had cohabited during the interim period between their first and second marriages.

working at Sikorsky Aircraft Corporation in 1986 and remained with that employer through the time of the second divorce. In 2000, the parties purchased a house for $315,000.[4] In 2001, the defendant accepted an assignment from his employer that required him to live in Turkey. After his departure, the parties grew apart and, in October, 2003, the plaintiff filed for divorce.

"A hearing was held on June 9 and 10, 2004, at which each of the parties testified. At the time of the hearing, the plaintiff was forty years old and the defendant was forty-three. The plaintiff's annual full-time salary was determined to be $52,676 and the defendant's, $153,495. The parties were in partial agreement as to the terms of a proposed property division and financial orders. They disagreed, however, as to the specifics of an alimony award, particularly as to its term, and to the distribution of the marital residence and the defendant's retirement accounts. The defendant was willing to pay alimony for two and one-half years, while the plaintiff requested a permanent award. With respect to the residence, the defendant was willing to transfer his interest therein to the plaintiff in exchange for $60,500. As to his retirement accounts, he submitted that only the amounts accrued during the second marriage were at issue and requested that they be awarded to him in full. The plaintiff requested the residence outright and 50 percent of the entire value of the defendant's retirement accounts.

"The court rendered an oral decision at the conclusion of the hearing and, thereafter, reduced its judgment to writing. Pursuant to the court's judgment, the parties were awarded joint legal custody of their one minor

---

[4] "The parties financed the purchase, in part, with a fifteen year mortgage loan. At the time of the dissolution proceedings, the monthly mortgage payments were approximately $2700. The parties stipulated that the house then was worth $390,000." *Loughlin* v. *Loughlin,* supra, 93 Conn. App. 621 n.4.

child, the sixteen year old son. The son's primary residence was to be with the plaintiff, and the defendant was ordered to pay $272 weekly in child support and provide for the son's health insurance.[5]

"With respect to the distribution of the parties' assets and liabilities, the defendant was ordered to transfer his interest in the marital home, and all of its contents, to the plaintiff,[6] and the defendant was awarded the entirety of his 401 (k) retirement account.[7] The court considered the equity in the home and the value of the defendant's 401 (k) to be roughly equal.[8] The defendant was to assume responsibility for payment of the elder daughter's student loan and to pay for the entirety of the son's college education.[9] The parties were to divide equally the expenses of the younger daughter's attendance at a community college. The defendant also was to repay the younger daughter's automobile loan.[10] The defendant additionally was to convey to the plaintiff, by way of a qualified domestic relations order, 50 percent of the current value of his pension, which had accrued over the whole of his employment at Sikorsky Aircraft Corporation.[11] Finally, the court ordered him

---

[5] The court awarded the defendant the right to claim the federal income tax deduction for the son.

[6] The court awarded the plaintiff the right to claim the mortgage interest and property tax deductions for federal income tax purposes.

[7] The court specified that the children were to be named as the beneficiaries of the defendant's 401 (k) death benefit until they reached the age of twenty-three.

[8] "The plaintiff's affidavit valued the equity at $137,000, and the defendant's affidavit valued it at $161,761. The defendant's 401 (k) balance was $127,042." *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 622 n.10.

[9] The balance on the elder daughter's student loan was approximately $35,000.

[10] The balance on the younger daughter's car loan was approximately $6700.

[11] The court instructed that the defendant's son was to be named the beneficiary of the pension in the event of the defendant's death until the son turned twenty-three. At the time of the hearing, the present value of the pension was $92,047.

to pay $7500 of the plaintiff's attorney's fees, which totaled $10,000. The plaintiff was to be responsible for her own car loan and a credit card account.[12]

"With respect to alimony, the court ordered the defendant to pay the plaintiff $600 weekly for twelve years. The court explained that it set the alimony rate at an amount that essentially would cover the mortgage payment on the marital home and set its term for the amount of time left on the mortgage. It specified that the duration of the alimony would be nonmodifiable by either party. The court further ordered the defendant to obtain life insurance, initially naming the children as beneficiaries and then, once the children reached the age of twenty-three, naming the plaintiff as beneficiary for the duration of the alimony obligation and in a declining amount equal to the remaining alimony payments.

"The defendant thereafter filed motions to reargue and for articulation. In his motion to reargue, he took issue with the term of the alimony award, his failure to receive any interest in the marital residence, the awarding of one half of his pension to the plaintiff and the requirement that he pay a portion of her attorney's fees. A hearing on the motions was held on June 29, 2004, at which the court further articulated some of the reasoning underlying its orders. The court also issued a written articulation on September 30, 2004." Id., 621–24.

The defendant then appealed from the judgment of the trial court to the Appellate Court. The defendant first claimed that, in contravention of the criteria outlined in §§ 46b-81 and 46b-82, the trial court improperly had relied on the total length of the relationship of the parties, including the first marriage and intervening cohabitation, rather than solely on the length of the

---

[12] The balance of the plaintiff's car loan was $15,500, and, according to her affidavit, the credit card account did not have a balance.

second marriage, when it crafted its financial orders pursuant to the dissolution judgment. Id., 625–26. Second, the defendant claimed that the trial court improperly had considered the presence of the parties' adult children and grandchild in the marital home in fashioning an alimony award to ensure that the plaintiff retain the home as a family residence.[13] Id., 632. Upon review of the record, the Appellate Court determined that the trial court had in fact considered the parties' entire relationship as well as their adult children and grandchild when fashioning its financial orders. Id., 639–40. The Appellate Court conducted a comprehensive analysis of the statutory scheme for alimony and support orders, Connecticut case law and case law from other jurisdictions and further determined that such considerations were improper. Id., 634–40. The Appellate Court therefore concluded that the trial court had abused its discretion, and, accordingly, reversed the judgment of the trial court with respect to the property and financial awards only and remanded the case to the trial court for further proceedings. Id., 641. We thereafter granted the plaintiff's petition for certification to appeal. We affirm the judgment of the Appellate Court. Additional facts will be set forth as necessary.

I

We begin with the plaintiff's claim that the Appellate Court improperly concluded that the trial court had relied on the total length of the parties' relationship in fashioning its financial orders. She contends that the

---

[13] The defendant also claimed that the trial court had abused its discretion in awarding attorney's fees to the plaintiff in the absence of a showing of her inability to pay those fees. The Appellate Court did not reach this issue because it concluded that, in light of its remand for reconsideration of all of the financial orders, a change in the order regarding attorney's fees was likely to result. *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 620 n.2. Because we affirm the judgment of the Appellate Court, we agree that the order regarding attorney's fees in this case properly may be reconsidered by the trial court on remand.

trial court instead properly relied on the remaining term of the mortgage in setting the duration of its alimony order and reasonably offset the defendant's 401 (k) award with the marital home when distributing property. The plaintiff further contends that the Appellate Court did not read the trial court's references to the "totality of the relationship" in context and that these references merely reflected the court's thinking. The defendant counters that the trial court's written articulation as well as its oral decision and comments throughout the trial clearly indicate that the court made its decision on the basis of the length of the prior marriage, the cohabitation and the second marriage.[14] We conclude that the record supports the Appellate Court's conclusion that the trial court improperly relied on the total length of the parties' relationship in crafting its financial orders.

We note at the outset that the financial orders at issue in the present case, the property distribution and alimony orders, are governed by §§ 46b-81 and 46b-82, respectively. See footnotes 1 and 2 of this opinion. Under these statutes, the court "shall consider," inter alia: "the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate . . . and needs of each of the parties . . . ." General Statutes § 46b-81 (c); see General Statutes § 46b-82 (a). We first must determine whether, as a matter of law, the term "length of the marriage" would permit the trial court to include the prior marriage and interim cohabitation of the parties. Because the period of the parties' relationship prior to the second marriage consisted of two parts, the first marriage and the inter-

---

[14] We note that the trial court signed a transcript of the June 29, 2004 hearing, thus certifying that its statements therein are deemed significant to its reasoning unless expressly disavowed. See Practice Book § 64-1.

mediate period of cohabitation that preceded the second marriage, we consider each in turn.

Initially, we note the standard of review. This court has observed: "Although created by statute, a dissolution action is essentially equitable in nature. . . . The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a marriage. . . . [I]n the exercise of its inherent equitable powers it may also consider any other factors [besides those enumerated in the statute] which may be appropriate for a just and equitable resolution of the marital dispute." (Citations omitted; internal quotation marks omitted.) *Sands* v. *Sands*, 188 Conn. 98, 105, 448 A.2d 822 (1982), cert. denied, 459 U.S. 1148, 103 S. Ct. 792, 74 L. Ed. 2d 997 (1983). Thus, generally, "in . . . questions arising out of marital disputes, this court relies heavily on the exercise of sound discretion by the trial court." *Cummock* v. *Cummock*, 180 Conn. 218, 221, 429 A.2d 474 (1980). A less deferential standard applies, however, when the decision of the trial court is "based not on an exercise of discretion but on a purported principle of law." Id.

Therefore, to the extent that "[r]esolution of this issue requires us to interpret the statutory scheme that governs . . . support determinations in Connecticut . . . [it] constitutes a question of law. *Charles* v. *Charles*, 243 Conn. 255, 258, 701 A.2d 650 (1997). [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . *Keeney* v. *Old Saybrook*, 237 Conn. 135, 143, 676 A.2d 795 (1996). When the question of law involves statutory interpretation, that determination is guided by well settled principles. We have previously stated that in construing statutes, [o]ur fundamental objective is to ascertain and give

effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Unkelbach* v. *McNary*, 244 Conn. 350, 357, 710 A.2d 717 (1998).[15]

As a threshold matter, we note the absence of legislative guidance as to the meaning of "length of the marriage." The phrase occurs only in the two statutes that we now consider. Nor is there a definition of "marriage" in the General Statutes from which to begin this inquiry. The treatment of marriage as distinct from cohabitation, however, has been the subject of considerable case law in this state.

As the Appellate Court initially noted in considering the legal status of the period of cohabitation that immediately preceded the marriage at issue in the underlying action, when the parties first divorced in 1992, they "reassumed the legal status of two single people, regardless of their intentions." *Loughlin* v. *Loughlin,* supra, 93 Conn. App. 628. Indeed, in *Hames* v. *Hames,* 163 Conn. 588, 316 A.2d 379 (1972), this court remarked on this status under facts similar to those we face today. The parties in *Hames,* who had been married, divorced and later remarried, appeared before this court in a

---

[15] In addition, although we are mindful of the legislative guidance in General Statutes § 1-2z, providing that "[t]he plain meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered"; because neither party claims that the statutory language is plain and unambiguous, and because the text of the statute itself does not illuminate the meaning of the term at issue, we proceed according to our usual practice in statutory construction.

second dissolution action in which one party contested the validity of the parties' second marriage. In evaluation of that issue, this court commented: "In the eyes of the law, needless to say, a divorced pair could be but two single persons desirous of acquiring marital status. Thus, it is clear that no act whatsoever could have revested legal status in the previously terminated marriage." Id., 594. Thus, in the present case, once the parties had divorced in 1992, the rights and benefits that attended their first marriage were terminated in the eyes of the state.

Furthermore, as the Appellate Court noted, Connecticut, as a matter of public policy, does not recognize common-law marriage. *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 628–29. As the *Hames* court noted, "[i]n this jurisdiction, common-law marriages are not accorded validity . . . for our statute has been construed to require the marriage contract to be entered into before authorized persons and with certain formalities which the state has prescribed." (Citation omitted.) *Hames* v. *Hames*, supra, 163 Conn. 593; see also *McAnerney* v. *McAnerney*, 165 Conn. 277, 285, 334 A.2d 437 (1973) ("although two persons cohabit and conduct themselves as a married couple, our law neither grants to nor imposes upon them marital status"); *State ex rel. Felson* v. *Allen*, 129 Conn. 427, 432, 29 A.2d 306 (1942) ("Cohabitation does not make a marriage . . . . Our law does not recognize common-law marriages." [Internal quotation marks omitted.]). Thus, cohabitation in and of itself does not create any legal or support obligations. *Boland* v. *Catalano*, 202 Conn. 333, 339, 521 A.2d 142 (1987) ("rights and obligations that attend a valid marriage simply do not arise where the parties choose to cohabit outside the marital relationship").

The Appellate Court concluded, and we agree, that, given Connecticut's policy of drawing a clear distinction between marriage and cohabitation, and of awarding

greater rights and protections to persons who make the formal legal commitment of marriage, "it would be incongruous to conclude that a court, when entertaining financial orders pursuant to §§ 46b-81 and 46b-82, may take into account a period of premarital cohabitation as an additional equitable consideration." *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 630. We have noted as a "fundamental principle of adjudication . . . [that] [j]ust as the legislature is presumed to enact legislation that renders the body of the law coherent and consistent, rather than contradictory and inconsistent . . . courts must discharge their responsibility, in case by case adjudication, to assure that the body of the law—both common and statutory—remains coherent and consistent." (Citation omitted.) *Fahy* v. *Fahy*, 227 Conn. 505, 513–14, 630 A.2d 1328 (1993).

We are mindful that a dissolution court properly may consider events that occur during a period of cohabitation as indirectly bearing on *other* statutory criteria, such as the "health, station, occupation, amount and sources of income, vocational skills . . . [and] employability . . . ." General Statutes §§ 46b-81 (c) and 46b-82 (a). Based on the previously reviewed jurisprudence of this state, however, it is clear that consideration of a period of cohabitation that precedes a marriage as part of the statutory factor of "length of the marriage" in a dissolution action is improper.

We next consider the possibility of considering the parties' first marriage as part of the "length of the marriage" under §§ 46b-81 and 46b-82. At the outset, we note that the statute does not utilize the plural "length of the marriages," but restricts the allowable consideration to "the marriage." Although remarriage between parties is not common, neither is it a circumstance so extraordinary that we must assume it necessarily is beyond the contemplation of the legislature. In fact, there are at least two instances in which this court

previously has heard appeals involving the remarriage of parties. See *Rostain* v. *Rostain*, 213 Conn. 686, 687, 569 A.2d 1126 (1990) (dissolution action in which parties previously had married, divorced, then remarried); *Ogles* v. *Warren*, 148 Conn. 255, 259, 170 A.2d 140 (1961) (custody dispute in which maternal grandparents had divorced and remarried). Nor does the statutory language instruct the court to consider the "length of the relationship" of the parties. Thus, the legislature has not given any indication that it intends for the courts to consider any relationship beyond the "length of the marriage" being dissolved.

There is no dispute that there was a prior dissolution of the parties' first marriage. This court previously has "recognize[d] the need for finality between parties in a divorce proceeding." *Delahunty* v. *Massachusetts Mutual Life Ins. Co.*, 236 Conn. 582, 597, 674 A.2d 1290 (1996). "A valid divorce judgment is a judgment in rem and is binding on all the world as to the existence of a status which is the subject of the action, that is, the status of being unmarried upon the adjudication of divorce." (Internal quotation marks omitted.) *Vogel* v. *Sylvester*, 148 Conn. 666, 670, 174 A.2d 122 (1961); cf. 24 Am. Jur. 2d 572–73, Divorce and Separation § 411 (1998) ("The doctrine [of res judicata] is fully applicable to judgments and decrees entered in an action for a divorce . . . . Thus, a final decree of divorce is res judicata with respect to all issues which were, or could have been, litigated in the proceeding.").

In a related context, concerning a dispute over property distribution in a dissolution agreement, this court held that, "[a]ny claim to a greater interest in the land based on matters which predate the divorce decree is now barred by the doctrine of res judicata." *Varley* v. *Varley*, 189 Conn. 490, 495, 457 A.2d 1065 (1983); see also *Cleveland* v. *Cleveland*, 161 Conn. 452, 459–60, 289 A.2d 909 (1971) (to limit power of trial courts and give

effect to principle of res judicata, there must be material change of circumstances for court to modify custody, support or education orders).

From the aforementioned authorities, it is clear that the public policy of Connecticut supports the res judicata effect of dissolution agreements on all issues therein addressed. Although we have recognized that "res judicata does not require all issues between spouses to be litigated in the dissolution proceeding"; *Delahunty* v. *Massachusetts Mutual Life Ins. Co*, supra, 236 Conn. 598 (exception for tort action); those issues that are litigated in a dissolution proceeding generally are precluded from subsequently being relitigated.[16] See *Borkowski* v. *Borkowski*, 228 Conn. 729, 735–36, 638 A.2d 1060 (1994) ("[T]o avoid re-litigation of matters already settled, courts in modification proceedings allow the parties only to present evidence going back to the latest petition for modification. . . . Alimony decrees may only be modified upon proof that relevant circumstances have changed since the original decree was granted." [Internal quotation marks omitted.]). In the present case, the 1992 dissolution court considered the length of the parties' first marriage in deciding the alimony and property distribution awards pursuant to the dissolution of that marriage. Thus, to permit the reconsideration of the first marriage as part of the "totality of the relationship" of the parties in the 2004 dissolution proceeding would contravene the doctrine of res judicata with respect to the first dissolution judgment.[17]

---

[16] An exception to this rule of preclusion for fraud; see *Weinstein* v. *Weinstein*, 275 Conn. 671, 685, 882 A.2d 53 (2005) ("[a] marital judgment based upon a stipulation may be opened if the stipulation, and thus the judgment, was obtained by fraud" [internal quotation marks omitted]); is not relevant to this case.

[17] Like the Appellate Court, we find guidance in decisions of our sister courts, which, in considering allocation of assets in dissolution cases involving serial marriages, held that remarriage of the parties did not vitiate the effect of a prior divorce decree concerning financial awards and property

Having determined that the "length of the marriage" criterion prescribed in §§ 46b-81 and 46b-82, as a matter of law, does not include prior marriages or cohabitation preceding the marriage, we must determine whether, in considering the length of the marriage, the trial court in fact took into account the entire period of the parties' relationship, including their first marriage and subsequent cohabitation, when crafting its financial orders. We note that, because the parties were first married in 1981, divorced in 1992, cohabited from 1993 until their second marriage in 1998, and were divorced for the second time in 2004, the difference between the length of their entire relationship, approximately twenty-two years, and the length of their second marriage, six years, is not insubstantial. We conclude that the trial court did consider the entirety of the relationship and thus based its financial awards in part on impermissible considerations.

The following additional facts are relevant to our discussion of this issue. On the first day of testimony, the plaintiff began to describe how she had put her education on hold to start a family. The defendant's counsel objected on the ground that the testimony related to the first marriage, the dissolution of which

distribution. See, e.g., *Waldrep* v. *Goodwin*, 348 So. 2d 491, 492 (Ala. 1977) (remarriage does not abrogate property settlement entered in previous divorce); *Wooldridge* v. *Wooldridge*, 791 A.2d 107, 109 (Me. 2002) (holding that "remarriage does not reunify the property of each spouse as marital property . . . [and determining] no error in the court's refusal to treat as marital or otherwise redistribute each parties' nonmarital interest in the real property acquired pursuant to the [parties' previous] divorce judgment" [citations omitted]); *Di Santo* v. *Adase*, 281 A.2d 810, 811 (N.J. Super. App. Div. 1971) (absolute divorce terminates marital relationship and converts estate by entirety into tenancy in common; remarriage does not revive estate by entirety); but see *In re Marriage of Chapman*, 191 Cal. App. 3d 1308, 1314–15, 237 Cal. Rptr. 84 (1987) (holding that, although trial court may base its support award only on present marriage, in certain limited circumstances, parties' past relationship may have equitable bearing on present support obligations).

already had been adjudicated, and not the second marriage. The trial court overruled the objection and allowed the testimony, commenting: "I agree with you, counsel, but certainly the accumulative [e]ffect of these two marriages, I mean, they were—I [am] assuming you were involved in the eight years between the two marriages too, right?" Later the same day, the trial court asked the plaintiff if she thought the court "should look at this marriage as a six year marriage or . . . as a longer marriage." The plaintiff responded: "[L]onger. . . . We've been together for almost twenty-three years. I mean there was a short period in time but it resumed rather quickly and even though we weren't remarried, we acted as if we were married."

On the second day of trial, the parties gave their summations and the trial court issued its oral memorandum of decision. During summation, while the plaintiff's counsel was arguing for permanent alimony for the plaintiff, the court commented: "If I go six years, then I'm basing it on the second marriage, and you want me to go longer. So why don't you argue why I [should] go longer than six years?" Thereafter, when the parties were arguing about whether assets acquired during the first marriage should be included in the current dissolution proceedings, the court remarked, referring to the dissolution agreement from the first marriage: "But [the plaintiff] didn't get any part of the pension, then." Finally, when it issued its oral decision, the court noted, "first of all, obviously we go back to 1981 in some respects but it's a long-term relationship which maybe . . . it should have been severed permanently but it wasn't, and here we are back again."

At the hearing on the defendant's motions to reargue and for articulation, in response to the plaintiff's argument that the court's adjudication was fair and abided by the statutory terms, the court noted: "But [the defendant is] arguing that I shouldn't or couldn't consider

. . . the totality of the marriages and involvement." The plaintiff's counsel replied: "I don't think that you did. I don't think that in your decision that you did consider the first marriage. I think that you considered the station of the parties. I think you considered the length of this marriage. I think you considered the earning capacities." The court responded: "*Unfortunately, I also considered the totality of their relationships. . . .* I considered the totality of the relationships and family relationships and I'm not saying I'm changing anything . . . . I'm trying to give [the defendant's counsel] something . . . for the record. I hope it doesn't hurt [the plaintiff's] case. I'm just telling you that I considered that they were together, you know, even as sweethearts I guess, before they—[the plaintiff] devoted I don't know how many years of her life to this gentleman. . . . [*Y*]*ou're pinning me down to say six years of marriage. Obviously, I considered more than that.* . . . Now, if that's appealable, you know, I did do that counsel, and you know that." (Emphasis added.) The defendant then tried to clarify what the court meant, asking, "when you say you considered the . . . totality of the relationship . . . that would include the first marriage . . . [i]s that right?" The court responded: "However you want to put it. I consider their involvement together twenty-five years . . . . I looked at the entire relationship. I did do that. Now if that's appealable, I don't know. I'm sorry if I hurt your case any, counsel." When the defendant pointed out that the issues involved in the first marriage's dissolution already had been adjudicated and therefore properly could not be relitigated in the present case, the trial court responded that it did not know anything about the terms of that adjudication and whether the plaintiff had received a share of the disputed assets in the previous dissolution judgment.

In its written articulation, the court stated the following as the basis of its June 10, 2004 decision: "This court

also considered the totality of the relationship between the parties. The plaintiff had devoted almost [twenty-four] years to the relationship and the parties lived together almost immediately after the first divorce. This court did not feel constrained in its decision by the length of the second marriage which lasted from 1996 to 2004."[18]

In our view, the sum of the record clearly indicates that the trial court considered the entirety of the parties' relationship in rendering its judgment. Indeed, the trial court noted that it was unclear whether it correctly was applying the principles of law at issue in fashioning the financial orders. Although, as we mentioned previously, the court properly may have considered events that occurred during the cohabitation that may have affected other factors listed in §§ 46b-81 and 46b-82, we reasonably cannot construe the trial court's statements in the present case as indicating that the cohabitation period was considered only with respect to these factors. Rather, in response to a pointed inquiry by the defendant, the trial court indicated that it had considered the cohabitation, as well as the prior marriage, as part of the length of the marriage. Accordingly, the Appellate Court properly concluded that the trial court improperly had considered the period of cohabitation and the first marriage as part of the "length of the marriage" in crafting its alimony and property distribution awards.

We express no opinion herein as to whether the financial orders otherwise would be reasonable or whether the parties' relationship prior to their second marriage should indeed bear on factors other than the length of the marriage. In sum, "[w]ithout in any way prejudging what decision the trial court should have reached upon a factual determination of the relevant circumstances,

---

[18] As we have noted previously, the record is clear that the second marriage commenced in 1998.

we find the court to have been in error . . . as a matter of law"; *Cummock* v. *Cummock*, supra, 180 Conn. 222; in considering the first marriage and cohabitation as part of the "length of the marriage."

## II

We turn now to the second certified issue, whether the Appellate Court properly concluded that the trial court improperly had relied on the presence of the parties' adult children and grandchild in the home in fashioning the alimony award.[19] As we noted previously, at the time of the second dissolution trial, the parties' eldest daughter was twenty-two, their youngest daughter was twenty, and their son was sixteen, two years from the age of majority. The parties' younger daughter and her baby, as well as the parties' son, were living in the marital home with the plaintiff. The plaintiff claims that the trial court did not rely on the presence of her adult children and grandchild in making its alimony order, but rather on the remaining term of the mortgage and other equitable interests, and, accordingly, the Appellate Court's conclusion to the contrary was improper. The defendant contends, inter alia, that: (1) he has no legal obligation under these facts to support his adult children and grandchild; and (2) the alimony award is disguised postmajority child support because the trial court relied in part on the presence of the adult children in the house in fixing the term of alimony.

---

[19] We recognize that our resolution of part I of this opinion will result in the Appellate Court remanding the case to the trial court for further proceedings on the alimony order. *Grimm* v. *Grimm*, 276 Conn. 377, 386, 886 A.2d 391 (2005) ("The issue involving financial orders are entirely interwoven. The rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." [Internal quotation marks omitted.]). We nonetheless reach the second issue because of the likelihood that the presence of the adult children and grandchild in the marital home as a factor in fashioning the financial orders will arise on remand. See *Macomber* v. *Travelers Property & Casualty Corp.*, 277 Conn. 617, 638, 894 A.2d 240 (2006).

We agree with the Appellate Court that the trial court improperly relied on the presence of the parties' adult children and grandchild in the home when determining the alimony award.

The following additional facts are necessary to our resolution of this issue. On the second day of trial, when the parties were presenting their arguments to the court regarding alimony, the court noted: "[O]bviously, the house is a help for the children. I guess I'm telling you too many things. . . . But would . . . [the plaintiff] be able to handle the house if she only got six years of alimony?" Later the same day, when the defendant was making his argument about the distribution of property assets, the trial court commented, "[b]ut I also have to think about three children." When the defendant pointed out that two of the children were no longer minors and the third would reach the age of majority within two years, the court responded: "They still need a place, though. . . . [The younger daughter] has special needs right now." At the end of its oral decision, while explaining its financial awards, the court commented: "[The plaintiff] has a house for the kids to be at and that's important. No matter how old they are, they have to have a house to come home to. . . . And [the defendant] provided the wherewithal for that . . . ."

At the hearing on the defendant's motions for articulation and reargument, the court noted: "[The plaintiff] still has a family in need. I did consider all of that." Finally, in its written articulation of September 30, 2004, the court pronounced the basis for its decision: "The facts were clear. The plaintiff earned one third of the income of the defendant. The defendant had acquired a girlfriend while in Turkey. The plaintiff helped support the family while the defendant earned a bachelor's and master's degree at night. The mortgage on the family home had an additional [twelve] years, which the plain-

tiff could ill afford to pay on her own salary. Also, this family home was the residence of the minor child, two adult children and a grandchild. . . . The plaintiff was awarded alimony for [twelve] years nonmodifiable as to the term so that she would be able to live in the family home until the mortgage was paid in full."

On the basis of these references, we conclude that the record indicates that, although the trial court considered the term of the mortgage and other equitable factors, the court also considered the adult children and grandchild in fashioning its alimony award to meet the mortgage payments on a house to which those children could return. Accordingly, we now consider whether the court's reliance on these factors was proper.

We begin with the standard of review. "We preface this inquiry by reaffirming the established proposition that, although the court has broad equitable remedial powers in the area of marital dissolutions . . . our marital dissolution law is essentially a creature of, and governed by, statute." (Citation omitted; internal quotation marks omitted.) *Doe* v. *Doe*, 244 Conn. 403, 423, 710 A.2d 1297 (1998). "The Superior Court's power to grant divorces and thereby dissolve marriages comes from statutory authority, and from such jurisdiction over divorce derives the court's jurisdiction to make and enforce orders for care, custody and education of children. *White* v. *White*, 138 Conn. 1, 9, 81 A.2d 450 (1951); *LaBella* v. *LaBella*, 134 Conn. 312, 316, 57 A.2d 627 (1948); *Dunham* v. *Dunham*, 97 Conn. 440, 117 A. 504 (1922)." *Kennedy* v. *Kennedy*, 177 Conn. 47, 49–50, 411 A.2d 25 (1979). Thus, "it is well settled that judicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the court correctly applied the law and could reasonably have concluded as it did." (Internal quotation marks omitted.) *W.* v. *W.*, 248 Conn. 487, 495, 728

A.2d 1076 (1999). "Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." *Borkowski* v. *Borkowski*, supra, 228 Conn. 740.

We must determine, therefore, whether the trial court properly applied the law when fashioning the alimony order in this case. As a general matter, it is settled that the statutory obligation of a parent to support a child normally terminates when the child attains the age of majority, which currently is eighteen. *Cariseo* v. *Cariseo*, 190 Conn. 141, 142, 459 A.2d 523 (1983); see also General Statutes § 1-1d (defining " 'minor' " as "a person under the age of eighteen" and further providing that "any person eighteen years of age or over shall be an adult for all purposes whatsoever . . . and 'age of majority' shall be deemed to be eighteen years"). General Statutes § 46b-56 (a), which prescribes the guidelines for Superior Court education and support orders related to actions for dissolution of marriage, also refers to "minor children." General Statutes § 46b-84, which provides the guidelines for parents' obligations for maintenance after dissolution of a marriage, likewise refers in subsection (a) to "a minor child of the marriage . . . ."[20]

There are two circumstances in which the presence of a minor child theoretically could affect an alimony award, one proper and one improper. Under § 46b-82 (a), the court properly may consider, when "determining whether alimony shall be awarded, and the duration and amount of the award . . . in the case of a parent to whom the custody of minor children has been

---

[20] As we have noted previously, the trial court had entered an order for the defendant to pay child support for his sixteen year old son until he reached the age of majority. That order is not contested.

awarded, the desirability of such parent's securing employment." See footnote 2 of this opinion for the complete text of § 46b-82 (a). In this case, the trial court awarded the plaintiff physical custody of the minor child. The plaintiff's employment as a registered nurse, however, though discussed at trial in terms of the number of hours worked and net income received, was not discussed in terms of conflicting with child care, likely because the parties' youngest child was sixteen at the time of the dissolution. In fact, when the court discussed the duration of alimony in relation to the plaintiff's ability to pay the mortgage on the house, the court commented that she could make more money if she increased her current work schedule from approximately twenty-six hours per week to forty hours per week. Thus, it is clear that, when it fashioned its alimony award, the court was not concerned with the plaintiff's need to work less, and thereby earn less, in order to spend more time caring for the sixteen year old minor child. In other words, the trial court was not concerned with the economic impact on the plaintiff as an alimony recipient of caring for a minor child. See *Wolfburg* v. *Wolfburg*, 27 Conn. App. 396, 401–402, 606 A.2d 48 (1992) (trial court's rationale for time limited alimony to allow plaintiff time necessary to care for dependent child proper).

The second, but improper, way in which the presence of a minor child could, in theory, affect an alimony award is if the alimony is disguised child support, as the defendant in this case alleges. This court has not addressed directly the issue of child support disguised as alimony. In *Brown* v. *Brown,* 190 Conn. 345, 347–49, 460 A.2d 1287 (1983), however, we addressed the reverse allegation—that an award of child support was disproportionate to the needs of the children and was, in fact, alimony in disguise. In *Brown,* this court set aside the child support award and held: "Child support

orders must be based on the statutory criteria enumerated in . . . § 46b-84 of which one of the most important is the needs of the child. The support award may not be used to disguise alimony awards to the custodial parent." Id., 349. We see no reason why this reasoning should not apply to the present situation. As the Appellate Court noted, "[a]limony is payment for support of a former spouse and child support is payment for support of a minor child." (Internal quotation marks omitted.) *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 634; see also *Wolfburg* v. *Wolfburg*, supra, 27 Conn. App. 402 (alimony and child support "must be kept separate when the court determines the appropriate awards as to each"). Although as we have noted, pursuant to § 46b-82, alimony may be affected because of the lesser income a custodial parent is able to earn while caring for a minor child, under those circumstances, an alimony award should address the needs of that parent,[21] not the minor child, whose needs properly are addressed under a support order pursuant to § 46b-84.

We turn now to special exceptions for postmajority support. There are two pertinent principal provisions in the General Statutes that provide for parental support

[21] For example, in *Misinonile* v. *Misinonile*, 190 Conn. 132, 135 and n.1, 459 A.2d 518 (1983), this court found no factual basis for the defendant's claim that the trial court had awarded an impermissible support order in the guise of alimony when the minor child was mentally retarded and lived with the mother whose work schedule was "of necessity tailored so that she [could] cope with the constant needs of her child." This court found no impropriety in the trial court's comment that, "[t]o the extent that he is financially able, the father's responsibility in an abnormal situation such as this, should be reflected in the amount of alimony awarded, as against an order of support for the minor . . . which will terminate in less than two years. The father ought to contribute, if not in fact compensate the mother for surrendering her normal way of life; her chance to make a new life; and instead dedicating her remaining years to the care and welfare of her child." (Internal quotation marks omitted.) Id., 135–36 n.1.

for a child over the age of eighteen.[22] First, under General Statutes § 46b-56c (b), (c) and (e), a court may issue an educational support order for college age children upon a motion of a party and after making certain findings. There is no evidence in the present case that either party submitted such a motion to the trial court or that the trial court made the necessary statutory findings. Rather, the defendant voluntarily agreed to pay the balance of the parties' eldest daughter's college loan and the whole of their son's future college tuition, and to split their younger daughter's college tuition with the plaintiff, in the event that the younger daughter decided to attend college.

Related to this issue, in *Cariseo* v. *Cariseo*, supra, 190 Conn. 143, this court considered, "whether a substantial change of circumstances for modification of an alimony award may be predicated on financial obligations arising out of a parent's maintenance of adult children in the family home while they are attending college." In that case, we reversed the trial court's judgment awarding an upward modification based on the trial court's finding that, "although the college students had attained their majority, the mother was still feeding them and providing a roof over their heads and that it was disproportionate to have her bear the burden of maintaining these students while they were in college." Id., 142. This court disagreed with the trial court's reasoning and held that, "[e]xpenses incurred by a parent for the maintenance of an adult child while attending college cannot serve as a justification for modification of alimony."

---

[22] Additionally, we note that General Statutes §§ 46b-84 (b) and 46b-215 (a) (1) both contain provisions providing for temporary continuing support for a child who is an unmarried, full-time high school student living with a parent and in need of support until the child reaches the age of nineteen or completes the twelfth grade, whichever occurs first. Because the support order in the present case continues well beyond the age of nineteen, and was not entered pursuant to either of these provisions, they are not implicated in this matter.

Id., 143. Although, as the Appellate Court in the present case noted, "the factors underlying an initial alimony award differ from the standard for a modification"; *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 638; this court has held that "[t]he same criteria that determine an initial award of alimony are relevant to the question of modification . . . ." *Cummock* v. *Cummock*, supra, 180 Conn. 221. Thus, this court's decision in *Cariseo* further demonstrates that the financial burden incurred by a parent taking care of adult children is not a proper consideration in determining the amount of an alimony award.

The second provision that allows for postmajority support is found in General Statutes § 46b-66. Under § 46b-66 (a), if the parties to a dissolution action submit to the court a written agreement providing for the care, education, maintenance or support of a child beyond the age of eighteen and the court finds the agreement to be fair and equitable, it may incorporate it by reference into the order or decree of the court. There is no indication, however, that the parties submitted any such agreement to the trial court in this case. Thus, "[i]n the absence of a statute or agreement providing for postmajority assistance . . . a parent ordinarily is under no legal obligation to support an adult child."[23] *Loughlin* v. *Loughlin*, supra, 93 Conn. App. 636.

---

[23] We have found several cases in which other jurisdictions have invalidated awards of spousal support due to indications that they were intended to provide continuing assistance to adult children. See, e.g., *Gonzalez* v. *Gonzalez*, 563 So. 2d 813 (Fla. 1990) (because award of exclusive possession of home is incident of child support, court is unable to sustain award of exclusive possession of marital home beyond time child reaches age of majority because husband's obligation for support terminates at that time); *Grapin* v. *Grapin*, 450 So. 2d 853, 854 (Fla. 1984) ("a parent has no legal duty to provide post-majority support to an otherwise healthy child, absent either a finding of legal dependence or a binding contractual agreement by the parent to pay such support"); *Richard* v. *Richard*, 527 So. 2d 481, 483 (La. App. 1988) (needs of adult children should have no bearing on award of alimony); *Lesko* v. *Lesko*, 184 Mich. App. 395, 405, 457 N.W.2d 695 (1990) (court lacks jurisdiction to order child support for adult offspring and thus

Our decision in *Morris* v. *Morris*, 262 Conn. 299, 811 A.2d 1283 (2003), is instructive on the issue we confront in the present case. In *Morris*, the defendant had alleged that the trial court improperly relied on the parties' gross income, rather than net income, in modifying the defendant's child support obligation. Id., 300. In evaluating this claim, we noted the well settled law of this state is that a court must base child support and alimony orders on the parties' net, not gross, income, and that the trial court's memorandum of decision indicated that "the court affirmatively and expressly stated that it relied on gross income to determine available funds for support consideration." Id., 306. The plaintiff in that case had asserted that, because the trial court relied on financial statements submitted by the parties that contained both net and gross income, the trial court's decision should not be reversed simply because it mentioned gross income as a factor in its decision. Id. We concluded that, despite the fact that the trial court broadly had stated that its decision was based on proper financial affidavits, "because the trial court expressly and affirmatively states that it relied on gross income in determining the defendant's support obligation, the trial court abused its discretion because it applied the wrong legal standard." Id., 307.

As in *Morris*, we are left with a clear, statutorily based standard for the crafting of alimony and child

cannot order it surreptitiously through alimony); *Wojtowicz* v. *Wojtowicz*, 171 App. Div. 2d 1073, 569 N.Y.S.2d 248 (1991) (concluding that lower court improperly gave exclusive possession of marital home to plaintiff spouse, rather than ordering sale of home, when only child living in house was twenty-three years old, and noting that defendant should not be compelled to subsidize his adult child by providing him with living quarters).

Similarly, courts have invalidated support awards for grandchildren who are living in the marital home. See, e.g., *Nichols* v. *Nichols*, 14 S.W.3d 630, 637 (Mo. 2000) ("although [h]usband may have a moral obligation, he is not legally responsible for the support of his grandchildren"); *Baker* v. *Baker*, 866 P.2d 540, 546 (Utah 1993) (no statutory or common-law duty to support grandchildren).

support orders more generally, namely that, under the pertinent statutory scheme, notwithstanding the inapplicable exceptions we previously noted, a court may issue support orders only for minor children under the age of eighteen, and may order alimony only for the support of a former spouse, not for a child, whether a minor or an adult. Despite this standard, we have clear language from the trial court in the present case indicating that it considered the presence of the adult children and grandchild in the family home when it awarded alimony to the plaintiff in an amount sufficient to cover the mortgage payments on the home and to ensure that it would remain in her possession as a family home. In *Misinonile* v. *Misinonile*, 190 Conn. 132, 136, 459 A.2d 518 (1983), this court left open the question of, "[w]hether in making its determination [regarding the issue of alimony, the trial court] could consider the economic impact on the plaintiff of providing care and comfort for her child after she had attained her majority . . . ." We now decide that issue in the negative. We conclude that the Appellate Court properly determined that the trial court had abused its discretion by applying an improper legal standard when it considered factors outside of those prescribed in § 46b-82, namely, the presence of the parties' adult children and grandchild in the home, in fashioning its alimony award.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.